661 A.2d 375

**Dennis and Shirley DOUGHERTY, H/W and Frances M. Friel, Individually and as Administratrix of the Estate of Edward D. Friel, Deceased and John T. Harris, Jr. and Rebecca Harris, H/W**

v.

**EDWARD J. MELONEY, INC., Burnham Boiler Corp., White–Rodgers Co., a Division of Emerson Electric Company Thalheimer & Weitz Architects, P.C., the Phila. Gas Works Co., Phila. Facilities Management Corp., Barber–Colman Co., Honeywell Inc., Adcock & Matz Associates, Inc., McDonnell & Miller, Inc., and Consolidated Brass Co., ITT Corporation, and Conbraco Industries, Inc.**

**Appeal of WHITE–RODGERS CO., a Division of Emerson Electric Company (at 3193).**

**Appeal of Dennis and Shirley DOUGHERTY, Frances M. Friel, Individually and as Administratrix of the Estate of Edward D. Friel, Deceased, John T. Harris, Jr. and Rebecca Harris, H/W (at 3194).**

Superior Court of Pennsylvania.

Argued Oct. 18, 1994.

Filed May 31, 1995.

Reargument Denied Aug. 4, 1995.

202

204

James D. Crawford, Philadelphia, for White–Rodgers.

Donald E. Matusow, Philadelphia, for Dougherty.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

HESTER, Judge:

White–Rodgers, a division of Emerson Electric Company, appeals from a jury's determination that it is liable in this products liability action. The plaintiffs also filed a cross-appeal, raising one issue relating to the computation of delay damages. For ease, we refer to White–Rodgers as appellant until we address the plaintiffs' delay damages claim. We affirm.

This action arose from a boiler explosion at fire station number thirty-four, which is known to firefighters as Engine 34, in Philadelphia on May 3, 1986. At the time of the explosion, the only firefighters present were those of platoon C of Engine 27. On that evening, platoon C initially had been assigned to its own station, but at around 10:00 p.m., the platoon was "detailed" to Engine 34, which means that they had been sent to Engine 34 to cover alarms while members of Engine 34 were fighting a fire. Notes of Testimony, 10/8/91, at 36. Platoon C consisted of Captain John T. Harris, and Firefighters Edward Friel, Dennis Dougherty, and Bruce Weber. The explosion occurred at approximately 10:30 p.m. Thirty-one-year-old Firefighter Friel, who was bending over the boiler, was killed. Captain Harris, who was standing at the bottom of the basement steps, was blown back up the stairs by the force of the blast, suffered severe, permanent, orthopedic injuries, and has been unable to return to work. Firefighter Dougherty, who was standing near Captain Harris, suffered disfiguring burns over sixty percent of his body and also has not been able to return to work. Firefighter

Weber, who was on the first floor of the fire station, was not injured.

Three separate civil actions were instituted as a result of the incident: one by Frances M. Friel, individually and as administratrix of the estate of her deceased husband, Edward Friel; one by John Harris and his wife, Rebecca; and one by Dennis Dougherty and his wife, Shirley. The three actions subsequently were consolidated. While a number of defendants initially were involved in these proceedings, by the time of jury trial, most either had been dismissed or had settled with the plaintiffs.

The case was submitted to the jury based upon appellant's liability as manufacturer of a valve, a component part of the boiler. Appellees contended that appellant's valve, an automatic safety shut-off gas valve, failed to close, resulting in what is known as a runaway condition. A runaway condition results when gas is permitted to flow continuously to the burner which fires a boiler, and results in uncontrolled overheating thereby causing the boiler to explode. At trial, questions were raised as to whether the boiler had exploded or whether the explosion was caused by a gas leak and as to whether appellant's valve had caused the accident. However, on appeal, appellant does not contest the jury's determination that the boiler exploded or that its valve caused the boiler to explode.

As noted *supra*, appellant's product is an automatic gas safety shut-off valve designed to prevent a runaway condition, which appellees established was a widespread problem in the boiler industry. This safety valve would stop the gas flowing to the boiler if either one of two conditions occurred: 1) the boiler temperature rose beyond safe limits, or 2) the water level in the boiler became dangerously low. It was the former safety feature which failed in this case.

In its brief, appellant explains how the relevant safety device operated. When the valve was operating properly, the thermostat in the fire station would signal the gas valve to open when the temperature in the fire station dropped below

the level selected on the thermostat. An electromagnet in the valve then would be energized, pulling a metal armature against the electromagnet, which caused the gas valve to open. When the fire station warmed to the selected level, the thermostat would again signal the valve. The electromagnet then would release the metal armature and the valve would close.

Approximately ten years after it was installed, the valve intermittently began to fail to open; thus, gas did not flow to the boiler so that the fire station was without heat. In other words, the valve was stuck in the closed position even though the fire station had dropped below the temperature on the thermostat.

The evidence indicates that when the valve first began to fail, firefighters in Engine 34 would press a lever that protruded from a slot in the cap that covered the valve's inner workings. The protruding lever pressed against the armature attracted by the electromagnet and forced the armature against the magnet, opening the valve. The boiler then would start to operate. Eventually, the lever came off of the valve. Then, the firefighters would either tap on the cover or if that did not work, unscrew the metal cap that enclosed the valve and tap on the metal armature to get it to open. This enclosing metal cap was removed easily by removing two screws. Furthermore, the armature they pressed upon manually was the same one that was activated before the lever fell off.

The amount and type of actions the firefighters perform in order to open the armature when it was stuck was disputed at trial. We will examine this evidence in detail in connection with our discussion of whether appellant is entitled to judgment notwithstanding the verdict based on misuse of its product.

The reason the valve failed to open was the inability of the electromagnet, when energized, to attract the metal armature. Initially, when the valve was stuck closed, it continued to reclose once the desired temperature was reached. However,

on two or three occasions it stuck in the open position. On those occasions, the firefighters pulled on the armature to close the valve.

On April 23, 1986, the valve stuck in the open position twice, causing the boiler to overheat. On that date, the boiler was turned off, and Philadelphia Gas Works ("PGW") was called to remedy the situation. The first time, the PGW servicemen concluded that the valve was not operating properly and would not shut off the boiler when the desired heat was obtained because the armature was not aligned properly. They fixed the armature by bending it with pliers. The second time the boiler overheated, the PGW repairmen informed the fire captain on duty, Captain Gerard McKeown, that the entire valve needed to be replaced. This replacement was necessary because the armature had been bent out of shape and not aligned properly.

Captain McKeown was not authorized to approve the repair and advised the PGW repairmen he would obtain authorization. The PGW servicemen left but *failed* to tell Captain McKeown that the boiler could not safely be used again. The Captain obtained authorization for appellant's valve to be replaced and called PGW. A PGW repairmen came to the station on April 26, 1986, to replace the valve, but the station was locked and unoccupied. Tragically, the explosion occurred on May 6, 1986, before the valve was replaced.

At trial, appellees alleged that appellant was liable on three bases. First, it manufactured a defective product in that the cover to the valve should have been sealed, a safety feature available at the time of manufacture, so that no manual manipulation of the valve could occur. They contended that the possibility of the armature becoming bent from people tapping on it after removing the cap was foreseeable. This was particularly true, herein, appellees argued, since appellant actually provided a tool with the valve that could be inserted into a slit in the valve cover to operate the valve manually by pressing down on the same armature that the fireman depressed. With a sealed cover, any problems with the safety features of the valve, which cost less than $300, then would

have to have been remedied by replacement, preventing the possibility of runaway due to the bending of the armature, as occurred in this case.

Secondly, appellees alleged that the valve should have contained a warning not to tamper with its inner workings. Finally, appellees contended that appellant was negligent for failing to inform the manufacturer of the boiler that the valve could be dualed; in other words, two valves could be placed together with the second acting as a back-up to prevent a runaway.

On December 16, 1991, the jury returned verdicts against 1) appellant; 2) Burnham Corporation, the boiler manufacturer; 3) E.J. Meloney, Inc., the installer of the heating system; and 4) Thalheimer & Weitz Architects, P.C., which designed the fire station and hired the engineering firm which designed the heating system. Appellant and Burnham Corporation each were assigned a thirty percent share of liability. Meloney and Thalheimer each were assigned a twenty percent share of liability. The jury awarded approximately sixteen million dollars in damages collectively to the five plaintiffs.[1] Burnham and Meloney previously had settled with the plaintiffs. Thalheimer did not appeal the verdict.

After the filing of the appropriate post-verdict motions, the trial court molded the damage award to reflect the liability determination of the jury and added delay damages, resulting in an order entering judgment jointly and severally against appellant and Thalheimer in the following amounts:

1. in favor of plaintiff Dennis Dougherty in the amount of two million five hundred thousand dollars ($2,500,000.00), to which is added delay damages pursuant to Rule 238 Pa. R.C.P. in the amount of one million two hundred seventeen thousand dollars ($1,217,000.00), for a total judgment of three million seven hundred and seventeen thousand dollars ($3,717,000.00);

1. Appellant does not raise on appeal any question as to the amount of damages awarded.

2. in favor of plaintiff Shirley Dougherty, on her loss of consortium claim, in the amount of five hundred thousand dollars ($500,000.00);

3. in favor of plaintiff Frances M. Friel, Individually and as Administratrix of the Estate of Edward D. Friel, Deceased, in the amount of one million seven hundred and fifty thousand dollars ($1,750,000.00), awarded under the Pa. C.S.A. Wrongful Death Action Statute, to which is added Rule 238 delay damages in the amount of seven hundred seventy one thousand five hundred seventy five dollars ($771,575.00), for a total wrongful death award of two million five hundred twenty one thousand five hundred seventy five dollars ($2,521,575.00);

4. additionally, in favor of plaintiff Frances M. Friel in the amount of three thousand four hundred dollars ($3,400.00) under the Pa.C.S.A. Survival Action Statute, to which is added Rule 238 delay damages in the amount of one thousand four hundred ninety-nine dollars and six cents ($1,499.06), for a total survival action award of four thousand eight hundred ninety-nine dollars and six cents ($4,899.06);

5. in favor of plaintiff John Harris in the amount of one million one hundred and twenty five thousand dollars ($1,125,000.00), to which is added Rule 238 delay damages in the amount of four hundred forty-nine thousand four hundred thirty seven dollars and fifty cents ($449,437.50), for a total judgment of one million five hundred seventy-four thousand four hundred thirty-seven dollars and fifty cents ($1,574,437.50); and,

6. in favor of plaintiff Rebecca Harris, on her loss of consortium claim, in the amount of fifty thousand dollars ($50,000.00);

together with lawful interest thereon from the aforesaid date of the verdicts.

This appeal and cross-appeal followed.

The events surrounding the accident are as follows. Firefighter Weber witnessed the accident. He was assigned to

platoon C at Engine 27, along with Captain Harris, Firefighter Friel, and Firefighter Dougherty. He reported to work at 6:00 p.m. on May 3, 1986, and at approximately 10:00 p.m., platoon C was detailed to cover Engine 34 because the members of that fire station had been called to fight a fire.

Approximately twenty to thirty minutes after he arrived at Engine 34, Firefighter Weber noticed a volume of steam emanating from the running gear room, which is where firefighters keep their boots, hats, and firefighting coats. Firefighter Weber reported the steam to Captain Harris. Captain Harris, Firefighter Weber, and Firefighter Dougherty went in to examine the room while Firefighter Friel was "on watch," which means that he was manning the emergency radio. N.T., 10/8/91, at 41.

In the running gear room, the steam reached the ceiling, and the men noticed that a drain in middle of the room had water draining down into it. The water was black, and the men were able to determine that the steam was hot enough to melt some of the rubber from the boots. Firefighter Weber picked up a boot, which was hot. However, the men did not have time to discover from where the steam was emanating since just then "a run" came. *Id.* at 43. A run is a fire call.

The men immediately left. However, they were gone only ten to fifteen minutes because the fire, which was close to Engine 34, was being handled by another station. Platoon C immediately returned to Engine 34 where they again observed the steam. Captain Harris decided to examine the heating system, and Firefighter Friel, who knew where it was, led Captain Harris and Firefighter Dougherty in that direction.

Firefighter Weber, meanwhile, removed his running gear before he followed the other three men. As he arrived at the basement door, there was "an explosion" which resembled a "bomb." *Id.* at 47. The force was so strong that Firefighter Weber felt like someone had pushed him from behind, and it threw him across the floor.

After the explosion, Firefighter Weber heard Captain Harris calling to him, and he rushed to the basement door which

had much debris behind it. Firefighter Weber pushed the door open. Although the basement was pitch black, Firefighter Weber found Captain Harris who was covered with debris and cinder blocks. Firefighter Weber tried to drag Captain Harris, but Captain Harris screamed in pain. Fearing that Captain Harris had suffered a back injury, Firefighter Weber stopped. Firefighter Weber then heard Firefighter Dougherty calling faintly for him. Realizing that help was needed, Firefighter Weber reported the explosion on the engine radio. He checked on Captain Harris again and reassured him that help was coming. Firefighter Weber found his way down to the basement and found Firefighter Dougherty at the bottom of the stairs on top of a pile of debris.

When Firefighter Weber looked up, he saw Firefighter Friel laying face down in water that was covering the basement floor. Firefighter Weber immediately tried to pull Friel from the water but could not due to debris on top of Friel. Firefighter Weber then placed a cinder block under Firefighter Friel's head to keep it out of the water. Firefighter Dougherty kept repeating that he was hurt badly. Firefighter Weber went to him, grabbed him by his running coat, pulled him up, and carried him out of the basement, through the station and into the street. He returned in a futile effort to help Firefighter Friel.

Firefighter Dougherty confirmed Firefighter Weber's testimony to the extent that he was able. He remembered that on the night of the accident, he was detailed to Engine 34 between 6:00 and 10:00 p.m. and remembered investigating the steam prior to being called to fight a fire. He then recalls returning from the fire call and backing into the station. He remembers nothing after this, including the explosion. He awoke in the hospital.

Firefighter Dougherty also testified that on prior occasions when he had been detailed to Engine 34, he had not come into contact with the heating system and was not aware of any problems with the system. N.T., 10/9/91, at 11.

Captain Harris testified that he was aware that Engine 34 was experiencing difficulties with its heating system, stating that "scuttlebutt" indicated that Engine 34 had "a heating problem." N.T., 10/9/91, at 34. That was the extent of his knowledge. He confirmed that he entered the running gear room and observed steam. An alarm was received immediately after Captain Harris observed the steam, and he did not report the matter at that point. After the firefighters returned, Captain Harris decided to investigate if the heating system was creating the steam. Firefighter Friel went down the steps first, and Captain Harris followed.

The explosion occurred after Captain Harris reached the bottom of the steps and was standing in the doorway to the heating room. He did not smell the odor of gas inside the basement, did not hear any abnormal sounds from the boiler, and did not see steam or water in the basement prior to the explosion. Nothing appeared out of the ordinary. He recalls standing in the doorway and speaking with Firefighter Friel, who was bent over the boiler but does not recall what he was saying. He remembers the explosion, and a floating sensation. His next memory is of being awakened by Firefighter Weber. *Id.* at 39.

After the testimony relating to the accident itself, appellees presented the testimony of Fire Captain Nathaniel Carr, who investigated the incident for the fire marshal's office and concluded that the explosion was caused by the boiler.

Evidence relating to the boiler's heating problems followed. Fire Captain Gerard McKeown of Engine 34 testified that he kept a logbook of service calls made in connection with the boiler. His logbook indicated that on April 23, 1986, at 6:00 p.m., he checked the boiler, discovered that the hot water temperature was 260 degrees, shut down the boiler, and called Philadelphia Gas Works to repair the boiler. The repairmen from PGW arrived at approximately 7:00 p.m., told Captain McKeown that appellant's gas valve needed to be replaced, and quoted the price of the replacement valve. Captain McKeown told the repairman that he did not have the authority to approve the repair, and they left. The heater still was

not operating. Neither repairman told Captain McKeown not to turn the heater on again. Captain McKeown did not believe that the heater was turned on again between April 23, 1986, and May 3, 1986. Prior to the April 23, 1986 incident, Captain McKeown's personal experience with heating problems involved the pilot light, which had extinguished on several occasions, or a leaking pipe. Captain McKeown testified specifically that he was not at all familiar with an allegation that his firemen would tap on the valve to get the boiler to start and that the first time he heard about the practice was in court.

The next morning, the department with the authority to approve the purchase was notified and gave its approval. PGW was notified on April 24, 1986, at 10:00 a.m. to replace the valve. Several days later, Captain McKeown realized the work had not been performed and had another firefighter call the maintenance department and remind them that the valve had not been replaced. We will now address the various issues raised by appellant and examine the evidence relating to each issue raised on appeal as we address that issue.

## Applicability of Strict Liability

Appellant's first two claims relate to the applicability of products liability law to this action. It argues first that the trial court committed error in failing to perform the balancing test mandated by Pennsylvania law as to whether products liability should be applied to an action. Second, it contends that if such a balancing test had been performed, the court would not have submitted this case to the jury on the basis of products liability principles.

■ For its initial assertion, which is that appellate courts require the trial court to place its reasons on the record for submitting a case to the jury on the basis of strict liability, appellant relies upon *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), wherein our Supreme Court stated that a decision as to whether the condition of the product justifies placing liability upon the supplier must be made.

However, our subsequently-decided case law clearly provides that in the absence of a motion by the supplier or manufacturer asking the trial court to make an express ruling on the threshold determination of social policy, *Azzarello* contains no requirement that such a determination be made. *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 51 n. 6, 485 A.2d 408, 423 n. 6 (1984). In the absence of a motion for an express ruling, it is presumed that the court, by permitting the case to go to the jury, resolved the threshold determination against the supplier or manufacture. *Id.* In the present case, there is no indication that appellant asked the court to make its decision on the record; accordingly, this issue lacks merit.

Appellant's reliance on *Marshall v. Philadelphia Tramrail Co.*, 426 Pa.Super. 156, 165 n. 2, 626 A.2d 620, 625 n. 2 (1993), is misguided. In that case, we stated that while an on-the-record analysis regarding the social desirability of application of products liability law in a case may be useful to the appellate courts, we did not hold that it is required in the absence of an explicit request by the manufacturer.

■ Appellant next argues that if the threshold balancing test is applied, it is clear that application of products liability law in this case was inappropriate. Appellant notes that the case was submitted to the jury based upon the position that the valve was not safe for its intended use because the cover was removable easily and because the valve did not contain warnings not to tamper with the small armature which was tapped when the boiler did not heat. It then posits that the intended use of the valve, a valve for commercial boilers, was in commercial settings and thus, that any intended user of the valve was "a person knowledgeable about the operation of commercial heating systems." Appellant's brief at 28. It continues that therefore, as a matter of law, the intended user of the product would know not to tap the armature and application of products liability law was inappropriate.

This argument is meritless. Commercial boilers are used in churches, apartment buildings, office buildings, and many

other types of non-residential buildings. Persons knowledge-
able about the operation of commercial heating systems are
people who manufacture and repair such systems. Unless this
valve was to be sold only to such people, appellant's argument
fails. There is no indication that apartment owners or firemen
or clergymen or employees who are responsible for the gener-
al maintenance of office buildings are knowledgeable about
how boilers operate, the purpose of appellant's valve, or the
dangers of tapping appellant's valve to re-start an inoperable
boiler. The intended users of this product are no different
from anyone who owns a furnace in their home. They do not
necessarily know how it works. We therefore reject appel-
lant's argument that as a matter of law, the valve was safe for
its intended users.

### Judgment notwithstanding the verdict

Appellant's next set of claims involve its position that it was
not liable as a matter of law under applicable products liability
principles. First, we examine our standard of review in this
context.

In reviewing a motion for judgment n.o.v., the evidence
must be considered in the light most favorable to the verdict
winner, and he must be given the benefit of every reason-
able inference of fact arising therefrom, and any conflict in
the evidence must be resolved in his favor. Moreover, a
judgment n.o.v. should only be entered in a clear case and
any doubts must be resolved in favor of the verdict winner.
Further, a judge's appraisement of the evidence is not to be
based on how he would have voted had he been a member of
the jury, but on the facts as they come through the sieve of
the jury's deliberations. There are two bases upon which a
judgment n.o.v. can be entered: one, the movant is entitled
to judgment as a matter of law, and/or two, the evidence
was such that no two reasonable minds could disagree that
the outcome should have been rendered in favor of the
movant. With the first, a court reviews the record and
concludes even with all factual inferences decided adverse to
the movant the law nonetheless requires a verdict in his
favor, whereas with the second the court reviews the eviden-

tiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc.* 437 Pa.Super. 391, 396, 650 A.2d 83, 85 (1994) quoting *Moure v. Raeuchle,* 529 Pa. 394, 402–03, 604 A.2d 1003, 1007 (1992).[2]

 A manufacturer's liability for its defective products is outlined in section 402A of the Restatement (Second) of Torts, which was adopted by our Supreme Court in *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). Under section 402A, a plaintiff must prove that the product was sold in a defective condition that is dangerous to the user and that the defect was the proximate cause of the injuries. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975). In addition, it long has been the law that a defective condition includes the failure to give adequate warnings required for a product's safe use. *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454 (1992). A seller is required to give warnings that are needed to inform the user or consumer of the possible risks and inherent limitations of his products. *Id.*

### Warnings and Removable Covers

 Appellant presents the same argument with respect to its position that it was not liable for its failure to seal the valve cover and with respect to its position that it was not liable for its failure to warn against manual manipulation of the armature. That argument pertains to the fact that the valve was to be used in "commercial" boilers. Specifically, it argues as follows regarding the first basis of products liability presented to the jury:

> As explained above, the fact that the valve cover could be removed with a screw driver does not make the valve unsafe for its intended commercial use or for commercial users.

---

**2.** At page forty-two of its brief appellant alleges that for the same reasons outlined in its argument for judgment n.o.v., the verdict was against the weight of the evidence in that the jury rendered a verdict so contrary to the evidence as to shock one's sense of justice. Our sense of justice is not shocked by the verdict, and we will not overturn the verdict based upon appellant's cursory weight argument.

First, such users would be capable of overriding sealed valves if they wished to do so. Second, such users know better than to operate a gas valve as an on/off switch with the danger of bending the armature out of shape. Whether or not the valve had a sealed cover, a commercial user would know not to use the valve, whose purpose is to carry out the thermostat's commands, as a manual on/off switch for over a year.

Appellant's brief at 29 (citations to record omitted).

Similarly, with respect to the lack of warnings, appellant claims:

In this case, the intended user of the valve was an operator of commercial boilers. Such a user need not be warned not to open and tamper with the inner workings of a gas valve. The risks inherent in such manipulation are obvious to the professionals for whom a commercial heater is designed to be serviced and maintained.

Appellant's brief at 31.

We categorically reject these arguments based on appellant's total failure to produce any evidence that these firefighters were experienced boiler "professionals" or, for that matter, that they even knew any more about boilers than the average person. A manufacturer is not exempt from products liability law because he sells his products to commercial establishments. These plaintiffs were firefighters, not boiler repairmen. This argument would be acceptable if appellant sold its valve for boilers which were sold only to heating system repairmen.

However, appellant presented no evidence that anyone at Engine 34 or platoon C of Engine 27 knew how to operate or repair a boiler or knew what its valve did or did not do. Firemen are knowledgeable about the properties and dangers of fires, not boilers. *Compare Mackowick v. Westinghouse Electric Corp.*, 525 Pa. 52, 575 A.2d 100 (1990) (electricians are knowledgeable about the properties of electricity).

Instead, the evidence was that the firefighters knew how to light the pilot to the boiler and did so when the boiler did not

work because the pilot was extinguished. When the boiler did not operate and the pilot was lit, which happened only occasionally, the firefighters pressed the armature, imitating the function of the red lever that was missing. When anything more serious was wrong with the boiler, the firefighters called professionals, *Philadelphia Gas Works.*

In fact, Fire Marshal Carr testified specifically that this was the first time he had investigated a boiler explosion and that he did not consider himself an expert on boilers. Similarly, when asked whether he knew any firemen knowledgeable in the operation of boilers, Firefighter Francis Kane stated that he knew one firefighter who was a boiler "professional" and that the firefighter in question operated a plumbing and heating business as a second occupation. Finally, the firefighters who tapped on the armature to get the boiler to work stated that when they did so, they thought they were getting the boiler to function in a proper manner rather than creating a potential for a boiler explosion.

### Dualing

Appellant posits that it was not responsible for the boiler manufacturer's decision not to "dual" two of the valve's together. While true, this is not the basis upon which this issue was submitted to the jury. Appellees alleged that the boiler was defective in that a second valve was not installed as a back-up against runaway conditions. Appellees argued that Burnham, as manufacturer, was responsible for the decision as to whether to place a back-up valve on the boiler. However, Burnham presented evidence that it never had been informed about the dual valve manifold. The issue presented to the jury was whether appellant had told Burnham about this safety feature and not whether appellant was responsible for Burnham's decision not to "dual" the valve. *See* R.R. at 2089a.

### Misuse

Appellant defended on the basis, *inter alia*, that the valve had been misused by members of Engine 34 and requests judgment n.o.v. based on that misuse. Appellant contended that the misuse occurred when the valve failed to open

when the temperature was low and consisted of the firemen pressing the valve armature. Again without citation to the record, appellant suggests, "By their own admission, for well over a year, the firefighters banged-on, tapped, pushed, pulled and prodded a gas valve that had, by all appearances, worn out." Appellant's brief at 37. Appellant misrepresents the admissions of the firefighters of Engine 34 and ignores the fact that its own evidence regarding the nature of the manipulation of the valve was contradicted extensively.

The evidence on this issue follows. Appellant read into evidence the deposition of Firefighter Francis Kane. His deposition indicates that initially, the valve had a lever to push and this reset the valve if the heat would not come on. R.R. at 1670a. Later, when the lever "was not there," the firefighters would tap on the case or remove the cover, hit the armature, and the boiler would start. R.R. at 1670a.

Firefighter Kane testified that the lever that was pressed initially came through a slot in the cover of the valve. When it was gone, the firefighters would remove the cover and tap the armature so as to perform the *same* function initially performed by the lever. He described the lever as a red plastic device that resembled the end of a popsicle stick which came through the slot in the cover. Firefighter Kane first encountered the lever when he went to the basement with a PGW employee, and the employee hit the lever to reset the valve. Thereafter, when the lever was missing, the firefighters would remove the cover to the valve and hit or tap the armature to duplicate the *same* function that the lever once performed. Firefighter Kane stated specifically that when the lever disappeared and the boiler would not start, he would remove the cover, and he "pushed down the lever that the popsicle stick would have hit." R.R. at 1675a. Once or twice Firefighter Kane pulled the arm when the valve was stuck open.

Firefighter Steven Archibald of Engine 34, another firefighter involved in this activity, testified that in winter, 1985, the boiler would not turn on. R.R. at 384a. This was an intermittent problem. *Id.* at 385a. Firefighter Archibald would remove the unsecured cover and tap or press on the

armature to get the boiler to operate. *Id.* at 388a. He merely thought that he was getting the boiler to operate properly by pressing on the armature. He did this five or six times.

Finally, Lieutenant Richard Brooks of Engine 34, indicated the following. Most of the heating problems at the fire station occurred because the pilot light would extinguish. He was told how to re-light the pilot and did so when the boiler failed to operate. He stated that two or three times for two heating seasons, the boiler did not operate after the pilot was ignited. When that occurred, he was able to get the boiler to operate by tapping on the cover of appellant's valve with his knuckles. R.R. at 409a.

Appellant did present other evidence of misuse through the testimony of the Philadelphia Gas Works servicemen, John Meyer and Edward Pearson, who testified that they were told by the firefighters that the firefighters were inserting metal objects into the valve armature to keep it open. This hearsay evidence was refuted. Firefighter Archibald was questioned as follows:

Q. Did you ever stick anything in that valve in order to keep it open or in order to try to have it remain open?

A. Never.

Q. Did you know of anybody at Engine 34 who did that?

A. No, I do not.

R.R. at 389a.

Firefighter Kane's deposition reads similarly:

Q. Well, I'm just talking about the valve. Did you ever do anything to keep the valve in the open position other than tapping it?

A. To keep it from lighting?

Q. No. To keep it in the open position so the gas was flowing.

. . . .

A. No.

Q. Did you ever put anything on top of any lever to keep the gas flowing?

A. No.

Q. Did you ever jam anything into the valve to keep the gas flowing?

A. No.

Q. To your knowledge, did anyone at the fire station ever do anything like that?

A. No.

R.R. at 1678a.

Lieutenant Brooks was asked the same question:

Q. Lieutenant Brooks, there has been a representation in this court in opening speeches that Mr. Meyer is going to testify that while he was present [the] afternoon [of April 23, 1986] the firemen, which is obviously either you or Mr. Kane, according to your testimony, told him that they would jam something into that valve, a piece of metal or whatever, in order to keep that valve open at all times. Did you ever say anything of the kind to that repairman that afternoon?

A. No, I did not.

Q. Did you ever hear Francis Kane ever say anything like that to that repairman?

A. No, sir, I did not.

R.R. at 418a.

Furthermore, Captain Carr testified that he questioned Mr. Meyer and Mr. Pearson in connection with his own investigation. Neither PGW repairmen told him about the firefighters allegedly sticking items into the valve to keep it open. R.R. at 225a.

▉ Viewing the evidence in light of the appropriate standard, we cannot say that two reasonable minds would differ that it was unforeseeable that the valve cap would be removed and the armature would be tapped when the valve was stuck. This is especially true in this case since Firefighter Kane's testimony indicates that he started this procedure because it *replicated* the function of a lever which originally was on the valve itself. Only exceptionally negligent misuse of a product warrants grant of judgment n.o.v. in favor of the

manufacturer of the product. *See Mathis v. United Engineers & Constructors, Inc.*, 381 Pa.Super. 466, 554 A.2d 96 (1989). Normally, the issue of whether conduct involved in misuse is foreseeable is to be resolved by the jury. *See Sweitzer v. Dempster Systems*, 372 Pa.Super. 449, 539 A.2d 880 (1988); *Burch v. Sears, Roebuck & Co.* 320 Pa.Super. 444, 467 A.2d 615 (1983).

We conclude that the facts herein differ significantly from *Davis v. Berwind Corp.*, 433 Pa.Super. 342, 640 A.2d 1289 (1994), where we determined that a product's alteration was the intervening cause of a plaintiff's injuries as a matter of law. In *Davis*, the buyer, plaintiff's employer, removed a safety device from the product in direct violation of the manufacturer's specific warnings not to remove the safety device. We concluded that the decision to remove the safety device despite warnings not to do so was unforeseeable and a substantial change in the condition of the product and that the manufacturer should not be liable when a product's original design is so significantly altered against its specific instruction. Our holding also was premised upon policy concerns since the employer's removal of the safety device constituted a violation of state safety law.

Herein, there were no instructions or warnings, and the misuse did not involve removal of a safety device but involved taking off an easily-removable covering and duplicating the function of a device included in the manufacturer's original design. Thus, reasonable minds would differ as to the foreseeability of the firefighters' actions, unlike in *Davis*, and the issue properly was left to the jury to resolve.

### Superceding and Intervening Cause

■ Appellant also contends that the failure of the PGW repairmen to replace the valve is, as a matter of law, a superceding or intervening cause of the explosion, absolving it from liability. The Supreme Court recently spoke on this issue, stating that an actor is relieved from liability due to an intervening or superceding cause only if the intervening or superceding negligent acts were "so extraordinary as not to

have been reasonably foreseeable." *Powell v. Drumheller,* 539 Pa. 484, 492, 653 A.2d 619, 623 (1995). We cannot say, as a matter of law, that PGW's delay in replacing the valve was so extraordinary as not to be foreseeable.

### Evidentiary claims

Appellant next complains about various evidentiary rulings of the trial court.

"Our standard of review of the denial of a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or an abuse of discretion." *Robertson v. Atlantic Richfield Petroleum Products Company,* 371 Pa.Super. 49, 61, 537 A.2d 814, 820 (1988), *allocatur denied* 520 Pa. 590, 551 A.2d 216 (1988).

The appellant bears a heavy burden in persuading this court that such error occurred. In considering all of the evidence in the light most favorable to appellee we must, to reverse the trial court, conclude that the verdict would be changed if another trial were granted. *Id.*

When the basis of the request for a new trial is the lower court's ruling(s) on evidence, to constitute reversible error, such ruling "must be shown not only to have been erroneous but harmful to the party complaining." *Hart v. W.H. Stewart, Inc.,* 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989) (citations omitted). "An evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Id.*

*Wilson v. Donegal Mutual Insurance Co.,* 410 Pa.Super. 31, 34, 598 A.2d 1310, 1312 (1991).

██ Appellant first suggests that the trial court erred in precluding it from introducing into evidence reports appended to the fire marshal's reports. It contends that the reports were admissible as business records and that the reports appended to it were admissible because the fire marshal "solicited and reviewed" the reports "in reaching his conclusions." Appellant's brief at 44.

We need not consider whether the report of a fire marshal may be admissible under the business records exception to the hearsay rule. *See Githens, Rexsamer & Co. v. Wildstein,* 428 Pa. 201, 236 A.2d 792 (1968). The reports that appellant sought to admit were *not* reports of the fire marshal. They were reports prepared by outside agencies and related to testing of the various parts of the boiler. Fire Marshal Carr stated twice that he did *not* rely upon those test results in forming his opinion as to the cause of the explosion. R.R. at 226a, 228a.

Appellant attempted to gain admission of these reports based on the hearsay exception which allows expert reports to be admitted as long as those reports are relied upon customarily by the testifying expert in forming his opinion. It is clear that the rule provides that reports *relied* upon by a testifying expert in rendering his opinion are in some cases admissible if the testifying expert customarily *relies* upon that type of report in the practice of his profession. *See Allen v. Kaplan,* 439 Pa.Super. 263, 653 A.2d 1249 (1995). Since Captain Carr stated explicitly that he did not rely upon those reports, appellant failed to establish the foundation for their admissibility.

 The next issue concerns the trial court's alleged failure to allow appellant to cross-examine Captain Carr about the fact that the boiler, in violation of certain city ordinances, never had been registered or inspected. Appellant cites to a case holding that violation of a city ordinance is evidence of negligence. We do not question the propriety of this statement of law. However, appellant has not substantiated the merits of its claim by citation to the proper section of the record. It also fails to direct our attention to any city ordinances on this issue.

Specifically, in support of this argument, appellant cites to page 148a of the reproduced record where Captain Harris, not Captain Carr, was being cross-examined about whether he ever discussed the results of the fire marshal's investigation with Captain Carr. That portion of the reproduced record has

nothing to do with city ordinances. Thus, we do not know if the trial court did restrict Captain Carr's cross-examination or its rationale for such restriction. Further, we do not intend to scour the record to discover this information. Finally, the fact that a city ordinance was violated was not relevant herein since there is no evidence that any *plaintiff* or any *defendant* was responsible for ensuring the inspection or registration of the boiler.

■ Appellant's argument on its next evidentiary issue reads in its entirety as follows:

Thomas Bonner, PGW's Chief Operating Officer on the date of the accident, reviewed the Fire Marshal's conclusions concerning the cause of the explosion, shortly after the accident in 1986 and, while doing so, made highly-critical hand-written notations concerning certain of the Fire Marshal's conclusions which Captain Carr repeated at trial. (1737a; 1739a–1741a). At trial, five years later, Bonner lacked a present recollection of his earlier notations. However, his notations satisfied all requirements for admissibility under the past recollection recorded exception to the hearsay rule. The erroneous exclusion of these notations, which would have undermined portions of Captain Carr's trial testimony as to the cause of the accident, was highly prejudicial to White–Rodgers. *See* 1741a–1750a (excluding notations).

Appellant's brief at 46–47.

As noted above, the appellant has the burden of showing that an evidentiary ruling was in error *and* prejudicial. Appellant fails to indicate in what specific way Mr. Bonner's past recollection recorded was critical of the fire marshal's report. More importantly, however, is that the fire marshal's report established only one evidentiary matter: that the boiler exploded. Meanwhile, appellant's primary defenses were that the valve stuck open due to the manufacturer's failure to construct the boiler properly or that it was absolved from responsibility for the valve sticking open based on the fact that the firemen misused the valve.

Appellant fails to substantiate how Mr. Bonner's past recollection recorded aided in its defenses or would have affected the outcome at trial. Appellant neglects to indicate what his recollection was.

"The argument shall be followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). *Compare Commonwealth v. Rodgers*, 413 Pa.Super. 498, 605 A.2d 1228, 1239 (1992), *appeal denied*, 532 Pa. 655, 615 A.2d 1311 (appellate brief must include pertinent discussion along with citation to pertinent authorities). Arguments that are not appropriately developed are waived. *Id., citing, Commonwealth v. Nelson*, 389 Pa.Super. 417, 422–23, 567 A.2d 673, 676 (1989), *alloc. denied*, 527 Pa. 623, 592 A.2d 44 (1990).

*Nimick v. Shuty*, 440 Pa.Super. 87, 655 A.2d 132, 138 (1995). Since appellant fails to refer to any authority in support of this contention that the trial court erred, the claim is waived. *Id.*

Appellant next contends that the trial court erred in precluding the display to the jury a video which showed that "if the boiler had been built as designed the explosion would not have occurred, even if the valve was stuck in the open position." Appellant's brief at 47. Appellant notes that the video showed that the firehouse boiler runaway would not have resulted in an explosion if it had been equipped with a certain back-up safety device. Initially, we question how this would relieve appellant from liability since *its* defective gas valve, which stuck in the "on" position, caused the situation which created the need for the safety device.

Second, appellant fails to cite to a case in this portion of its brief regarding which evidentiary rule supports admission of the videotape. The introduction of experiments as evidence was discussed in *Leonard v. Nichols Homeshield, Inc.*, 384 Pa.Super 1, 557 A.2d 743, 745 (1989) (emphasis added), wherein we stated that:

"[The] general rule regarding corroboration by experiments is that ... the demonstration may be admitted into evidence when the circumstances under which the experiment was

performed were sufficiently *similar* to the event in question to throw light on a material point in controversy and to assist the jury in arriving at the truth rather than to confuse the jury or prejudice the other party."

The record indicates that there were various *differences* in the videotaped boiler experiment and the boiler incident at issue. R.R. at 1760a–1772a. Accordingly, this claim fails.

 Appellant next complains that the trial court erred in not allowing it to cross-examine Glenn Sward, the director of engineering of Burnham Corporation, as an expert witness since Burnham had identified him as a potential expert witness during discovery. However, the record indicates that .Mr. Sward testified as a fact witness since Burnham settled prior to trial and the proposed cross-examination concerned matters beyond the scope of direct. In addition, during this cross-examination, appellant was attempting, once again, to introduce into evidence hearsay reports of non-testifying experts. No error occurred.

### Cross–Appeal

Cross-appellants-plaintiffs claim that the trial court erred in applying *Anchorstar v. Mack Trucks, Inc.*, 533 Pa. 177, 620 A.2d 1120 (1993), to eliminate its original assessment of delay damages on the consortium claims of Mrs. Harris and Mrs. Dougherty. Cross-appellants note that the issue was not raised in the timely filed response to cross-appellants' motion for assessment of delay damages but was raised via motion for reconsideration filed during the post-trial-motions phase of this action.

 Recent case law provides that an issue presented to a trial court in untimely post-verdict motions is considered preserved as long as the trial court chooses to address the claim presented in the untimely motion. *See Kurtas v. Kurtas,* 521 Pa. 105, 555 A.2d 804 (1989); *Commonwealth v. Sheaff,* 518 Pa. 655, 544 A.2d 1342 (1988); *Millard v. Nagle,* 402 Pa.Super. 376, 587 A.2d 10 (1991); *Pomposini v. T.W. Phillips Gas & Oil Co.,* 397 Pa.Super. 564, 568 n. 3, 580 A.2d

776, 778 n. 3 (1990), *aff'd on other grounds sub nom. Kepple v. Fairman Drilling Co.*, 532 Pa. 304, 615 A.2d 1298 (1992); *Commonwealth v. Sopota*, 403 Pa.Super. 1, 587 A.2d 805 (1991).

■ We do not view *Brocklehurst by Brocklehurst v. Watson*, 409 Pa.Super. 1, 597 A.2d 631 (1991), as changing this conclusion. In that case we held that a motion for Rule 238 damages must be filed timely since a Rule 238 motion is an affirmative request for assessment of damages and since Rule 238 is designed as a punishment for non-settling litigants. We did not discuss whether the trial court could consider untimely responses to such a motion.

Further, in *Brocklehurst* we distinguished a motion for delay damages from other post-verdict motions since the latter are designed to bring to a trial court's attention errors which question the integrity of the trial process. Thus, by considering untimely post-verdict motions, the trial court is deciding whether to right a wrong.

Finally, Rule 238 provides that if there is no opposition to a motion for delay damages, the trial court will assess those damages. However, the trial court still must calculate those damages properly. Nothing in the rule prevents a party from requesting reconsideration if the trial court utilizes the inaccurate figures or dates in calculating the damages.

Herein, cross-appellee's motion for reconsideration did not involve a request for punishment of plaintiffs. Rather, it clearly was bringing to the trial court's attention an error in calculation utilizing recent case law. Since this issue was presented to the trial court and addressed by it, even though the issue was not raised in a timely response to the motion for delay damages, the issue is preserved under the previously-cited case law, and we cannot accept cross-appellant's position that the issue resolved in the *Anchorstar* decision was "not properly raised or preserved." Cross-appellants' brief at 36.

Judgment affirmed.